IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17-00257-01-CR-W-DGK |
| ) | |
| LAMONT WHITE, ) | |
| ) | |
| Defendant. ) | |

<u>REPORT AND RECOMMENDATION</u>

This matter is currently before the Court on defendant's Motion to Suppress Evidence and Statement (doc #15). For the reasons set forth below, it is recommended that the motion be denied.

I. <u>BACKGROUND</u>

On August 9, 2017, the Grand Jury returned a one-count indictment against defendant Lamont White. The indictment charges defendant with being a felon in possession of a firearm.

An evidentiary hearing on the motion to suppress was held on February 28, 2018. Defendant White was represented by Assistant Federal Public Defender Ronna Holloman-Hughes. The Government was represented by Assistant United States Attorney Matthew A. Moeder. The Government called Sergeant Scott Simons, Sergeant John Bryant, and Detective John Straubel of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

II. <u>FINDINGS OF FACT</u>

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. At approximately 1:43 p.m. on March 15, 2017, Kansas City, Missouri police officers were dispatched to the area of 41st and Garfield regarding a call for suspicious car occupants. (Tr. at 11) The 911 call advised that there was an unknown female, possibly named Tonya or ABC, occupying a black Cadillac sedan with rear damage, and a black male with dreads and an unknown female occupying a blue Honda or Toyota two-door sedan, and that the occupants of those vehicles were involved with narcotics and possibly had guns. (Tr. at 11, 13; Government's Exs. 2 and 3) Sergeant Scott Simons testified that he gave credibility to the call because he was familiar with a female named Tonya, whose moniker was ABC, and who drove a black Cadillac with rear damage. (Tr. at 14-15) Sergeant Simons has encountered Tonya on quite a few occasions in locations where police deal with narcotics sales and violence. (Tr. at 14) However, Sergeant Simons had never arrested Tonya for drug distribution or seen her with any weapons. (Tr. at 26) Sergeant Simons testified that the area of 41st and Garfield is an area where there has been a lot of criminal activity, such as shootings, stabbings, and narcotics sales. (Tr. at 10-11) Sergeant John Bryant testified that there are a lot of abandoned houses in that area with prostitution and narcotics activities taking place. (Tr. at 30)

2. Sergeant Simons responded to the area of 41st and Garfield. (Tr. at 16) Sergeant Simons testified that as he was pulling up, he did not observe the black Cadillac, but he did see a blue two-door Honda. (Tr. at 16-17) The hood was up on the car. (Tr. at 17) As Sergeant Simons arrived on the scene, Officer Zoellner was also pulling up. (Tr. at 17) Sergeant Simons testified that as he was parking, he saw a black male with dreads (later identified as Lamont White) open the driver's door of the Honda, exit the vehicle, and start tinkering with the engine. (Tr. at 17-19) Sergeant Simons also saw a passenger in the front seat of the vehicle. (Tr. at 17) Sergeant Simons became suspicious when White exited the car immediately upon seeing the police pull up. (Tr. at 18) Sergeant Simons suspected that the car's hood was up because White was trying to make it look like he was having car problems and was stranded to distract from what was really going on. (Tr. at 18)

3. Officer Zoellner made contact with the female occupant of the Honda. (Tr. at 22) Sergeant Simons walked up to the male (defendant White) and asked if everything was okay. (Tr. at 18-19) Sergeant Simons testified that White said he was doing something with the oil. (Tr. at 20, 27) There was an oil bottle on the engine area. (Tr. at 27) Sergeant Simons testified that due to the nature of the call and from experience dealing with the violent crime in that neighborhood, he asked White if he had any weapons on him. (Tr. at 19, 21, 23) White said that he did not. (Tr. at 19) Sergeant Simons then asked White if he could frisk him. (Tr. at 19) Sergeant Simons testified that White gave Simons permission to frisk him. (Tr. at 19, 21-22) Sergeant Simons found no weapons or illegal contraband on White. (Tr. at 19, 23) Sergeant Simons testified that when he asked to frisk White, his gun was not drawn, he did not use any forceful language, and he did not make any

threats. (Tr. at 22-23) Sergeant Bryant showed up at the scene about the time that Sergeant Simons had started to conduct the frisk. (Tr. at 22-24, 37) Sergeant Bryant's vehicle was equipped with a dash camera. (Tr. at 31) The video of Sergeant Bryant's dash camera was admitted as Defendant's Exhibit 1. (Tr. at 31-34)

4. When Sergeant Bryant arrived at the scene, he walked up to the driver's door of the Honda. (Tr. at 24, 37) The hood was up and Sergeant Simons was with defendant White in front of the car. (Tr. at 40) Sergeant Bryant testified that he thought that Sergeant Simons had White handcuffed and under arrest. (Tr. at 40-41) Sergeant Bryant testified that the call was dispatched that there were firearms in the vehicle. (Tr. at 37) Standing outside the vehicle, Sergeant Bryant looked through the window into the vehicle to see if there were any weapons in plain view that might injure a citizen and/or his officers. (Tr. at 37, 39) Sergeant Bryant testified that the vehicle was parked on a public street and that when he looked in the vehicle he was on public property. (Tr. at 37-38) The windows of the vehicle were not tinted and there was nothing obstructing Sergeant Bryant's vision. (Tr. at 39) In the cup holder in the center console, Sergeant Bryant observed a sandwich baggie full of white rock crystalline-like substances that, through his years of experience as a police officer, he identified as possible crack cocaine. (Tr. at 38) There were miscellaneous items underneath the baggie, which raised it up above the cup holder. (Tr. at 38) Sergeant Bryant testified that in his 29 years of law enforcement experience, he has dealt with crack cocaine thousands of times. (Tr. at 38) Sergeant Bryant testified that after he saw what he believed to be crack cocaine, he continued to look through the window to see if there were any firearms in plain view. (Tr. at 40)

5. Sergeant Bryant then opened the car door and looked around inside the vehicle for a firearm. (Tr. at 40) Sergeant Bryant believed he had authority to enter the vehicle once he saw the crack cocaine. (Tr. at 40) Sergeant Bryant testified that the dispatched call had said there were narcotics and a firearm in the vehicle. (Tr. at 40) Since he had already seen the narcotics, Sergeant Bryant figured there would also be a firearm in the vehicle like the caller said. (Tr. at 40) Sergeant Bryant testified that he did not immediately notify the other officers about the crack cocaine because his focus was on getting into the car to make sure there were no firearms. (Tr. at 40) As he was looking for firearms, Sergeant Bryant saw through the crack in the hood that the individual standing and talking with Sergeant Simons (defendant White) was not in custody and was not handcuffed. (Tr. at 41) Sergeant Bryant stepped back out of the vehicle and tried to nod to Sergeant Simons to signal to him that the individual needed to be arrested. (Tr. at 42)

6. Sergeant Simons testified that he saw Sergeant Bryant look at him and give an affirmative nod, which Simons took to mean that Bryant had observed something that would cause the officers to place defendant White in handcuffs and take him

3

into custody. (Tr. at 24) Sergeant Simons assumed that White saw the nod at the same time because as Simons started to reach for White to place him in handcuffs, White took off running. (Tr. at 24) Sergeant Simons and Sergeant Bryant pursued White. (Tr. at 24, 42) White ran through some backyards and over some fences, but was eventually taken into custody. (Tr. at 24-25, 42) Sergeant Bryant was involved in the struggle that took place when officers caught White and arrested him. (Tr. at 42-43) On the video tape, Sergeant Bryant can be heard yelling, "Dope's in the console." (Tr. at 43, 50; Defendant's Ex. 1 at 1:51:31) Sergeant Bryant testified that he yelled this to alert the other officers of the location of the drugs so that an officer would recover those drugs quickly before someone else picked them up and took them away. (Tr. at 43)

7. Sergeant Bryant did not observe a firearm in the vehicle when he was looking prior to defendant White running off. (Tr. at 44) The vehicle was later searched by other officers and a firearm was recovered from under the driver's seat. (Tr. at 44, 55-56)

8. Detective John Straubel interviewed defendant White. (Tr. at 53) A recording of the interview was admitted as Government's Exhibit 6. (Tr. at 55) Prior to the interview, Detective Straubel read White his Miranda rights. (Tr. at 54; Government's Ex. 6 at 4:57-5:26) Detective Straubel asked White to sign a waiver form, but White would not sign stating that he had always been told never to sign anything. (Tr. at 54; Government's Ex. 6 at 5:29-5:46) However, White agreed to talk with Detective Straubel. (Tr. at 54; Government's Ex. 6 at 5:48-5:51) White stated that he was not in the vehicle when the police arrived and that he had not even been in the vehicle that day. (Tr. at 56; Government's Ex. 6 at 13:12-14:04) White denied ownership of the vehicle and possession of the vehicle on that day. (Tr. at 56)

## III. DISCUSSION

Defendant White seeks to suppress all evidence, and testimony related to such evidence, obtained as a result of the search and seizure of defendant and the vehicle he was driving. (Motion to Suppress Evidence and Statement (doc #15) at 1) Defendant argues that the search and seizure violated his rights under the Fourth Amendment because the police detained defendant and searched his person and his vehicle without a warrant, probable cause, or valid consent. (Id.) Defendant further argues that any statements he made to the police must be suppressed as fruit of the poisonous tree. (Id.)

4

A.     The Search of Defendant White's Person

In United States v. Rayos-Parra, 312 F.3d 343 (8th Cir. 2002), the court set forth the following with respect to the defendant's argument that he was unreasonably seized and searched in violation of the Fourth Amendment when officers approached him at an airport and asked for permission to search his person:

> … The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9 (1968)(quoting Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891)). Although there are significant restrictions upon police officers when conducting even minimally-intrusive searches and seizures, United States v. Poitier, 818 F.2d 679, 682 (8th Cir. 1987), consensual encounters between police officers and private citizens do not invoke Fourth Amendment protections, Florida v. Bostick, 501 U.S. 429, 434-35 (1991).
>
> The question in this case, then, is whether the officers' interactions with Rayos rose to the level of even a minimally-intrusive seizure. According to the government's account of the facts, the questioning would not have risen to a minimally intrusive, Terry-type stop, see Terry, 392 U.S. 1 (1968), because Rayos cooperated with police requests throughout their conversation at the airport. Following the appellant's recitation of the facts, the interactions may have risen to the level of a minimally intrusive seizure, because the officers' actions may have amounted to a stop and frisk when they demanded the search take place immediately, and began the search without Rayos's consent.
>
> Factual findings are reviewed by this court for clear error. United States v. Spotts, 275 F.3d 714 (8th Cir. 2002). If Rayos's conversation with the officers was consensual, then there was no Fourth Amendment violation. The district court resolved the factual dispute in the government's favor. There is nothing in the record to indicate that the district court erred in finding the officers' testimony more credible than Rayos's, and we do not think the district court's factual findings were clearly erroneous.

Rayos-Parra, 312 F.3d at 345-46.

5

Similarly, in United States v. Mendoza-Cepeda, 250 F.3d 626 (8th Cir. 2001), the court set forth the following with respect to the defendant's argument that he was subjected to an investigatory stop when officers approached him at an airport and asked for permission to search his person:

> Mendoza-Cepeda asserts that the encounter at the airport with the officers of the Commercial Interdiction Unit was an investigatory stop which, under the Fourth Amendment, required reasonable suspicion. We disagree. Although a person may not be seized without a reasonable suspicion of criminal activity, "the [Fourth] Amendment is not triggered by a consensual encounter between an officer and a private citizen. United States v. Perez-Sosa, 164 F.3d 1082, 1084 (8th Cir. 1998), cert. denied, 525 U.S. 1186 (1999). A consensual encounter, however, may become a seizure if there is a "threatening presence of several officers, [a] display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Hathcock, 103 F.3d 715, 718-19 (8th Cir.)(quoting United States v. White, 81 F.3d 775, 779 (8th Cir. 1996)), cert. denied, 521 U.S. 1127 (1997). Here, only two officers of the Commercial Interdiction Unit were present, no weapon was displayed, Mendoza-Cepeda was not physically touched until after he consented to the touching of his torso, and the language used by Sergeant Burns does not indicate that Mendoza-Cepeda's compliance was compelled. The encounter was in a public place, and Mendoza-Cepeda was not in custody at the time. The encounter between Sergeant Burns and Mendoza-Cepeda at the taxi stand did not constitute a seizure.

Mendoza-Cepeda, 250 F.3d at 628.

In order to determine whether a particular encounter is consensual or constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter. See Florida v. Bostick, 501 U.S. 429, 439 (1991); United States v. Robinson, 984 F.2d 911, 913 (8th Cir. 1993). As long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. Only when an officer, by means of physical force or show of authority, has in some

6

way restrained the liberty of an individual should a court conclude that a seizure has occurred. See Bostick, 501 U.S. at 434; Robinson, 984 F.2d at 913-14.

The government bears the burden of proving that an individual's consent was voluntarily given. See United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006), cert. denied, 549 U.S. 1292 (2007); United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). In United States v. Willie, the court set forth the following guidance in judging the voluntariness of a consent to search:

> Our case law offers a catalogue of factors to consider in judging the voluntariness of a defendant's consent to search. Some relate to the characteristics and behavior of the defendant, such as the defendant's age, intelligence and education, knowledge of his constitutional rights (whether from *Miranda* warnings in the encounter at issue or from previous interactions with police), whether he was under the influence of drugs or alcohol, and whether he objected to the search or stood by silently as it was occurring. ... Others relate to the environment surrounding the defendant at the time he gave his consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. ... Still others relate to the interaction between police and the defendant in the encounter, such as whether police officers detained and questioned the defendant for a long time before obtaining his consent, whether they threatened, physically intimidated, or punished him, and whether they made promises or misrepresentations upon which the defendant relied in giving his consent. ... No one factor is dispositive; they are merely tools for analyzing the "totality of all the circumstances." ...

462 F.3d at 896 (citations omitted).

The evidence before the Court shows that the initial encounter between Sergeant Simons and defendant White was consensual. Defendant White was parked on a public street, sitting in an automobile with its hood up, when police arrived. (Fact No. 2) As Sergeant Simons was parking, he saw White exit the vehicle and start tinkering with the engine. (Id.) Sergeant

7

Simons walked up to White and asked if everything was okay. (Fact No. 3) White told Sergeant Simons that he was doing something with the oil. (Id.) Due to the nature of the 911 call and from experience dealing with the violent crime in that neighborhood, Sergeant Simons asked White if he had any weapons on him and White said that he did not. (Id.) Sergeant Simons then asked White if he could frisk him and White gave him permission.[1] (Id.) The characteristics and behavior of defendant White suggest that White's consent was voluntarily given. White was 33 years old. (Indictment (doc #1)) Based on the taped interview, White appears to be of average intelligence (i.e. he answered Detective Straubel's questions appropriately). (See Government's Ex. 6) White was not a novice criminal.[2] (See Pretrial Services Report (doc #7) which lists White's various felony convictions) White exhibited the ability to decline an officer's request when he refused to sign the waiver form. (Fact No. 8) Next, the environment surrounding defendant White at the time he gave his consent suggests that White's consent was voluntarily given. The contact took place on a public street. (See Defendant's Ex. 1) White was not in custody and was not handcuffed. (Fact Nos. 5 and 6) Only one other officer, Officer Zoellner, was present at the scene when Sergeant Simons requested permission to frisk White and Zoellner was talking with the passenger of the vehicle. (Fact Nos. 2 and 3) Finally, the interaction between Sergeant Simons and defendant White suggests that White's consent was voluntarily given. When Sergeant Simons asked White for permission to perform the frisk, Simons's gun was not drawn, Simons did not use any forceful language, and Simons did not make any threats.

---

[1] The fact that Sergeant asked White if he could frisk him and White gave him permission differentiates this case from United States v. Monsivais, 848 F.3d 353, 358 (5th Cir. 2017), a case cited by defendant, where an officer "effectively seized Monsivais when he announced that he was going to pat him down."

[2] Prior encounters with the criminal justice system increase awareness of the rights of accused persons. See United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990).

(Fact No. 3) A request for consent to frisk implies that consent can be refused. See United States v. Drayton, 536 U.S. 194, 207 (2002)("And when [Officer] Lang requested to search Brown and Drayton's persons, he asked first if they objected, thus indicating to a reasonable person that he or she was free to refuse.") The Court finds that the government met its burden in establishing that defendant White's consent to the frisk of his person was freely and voluntarily given. There was no constitutional violation.

The Court notes that even if defendant White was illegally seized and frisked, which the Court finds did not occur, suppression would not be required. The Eighth Circuit Court of Appeals recently held that even if the police illegally frisk and seize a person working on a vehicle parked on a public street, an officer's subsequent discovery of a bag of illegal drugs in plain view in the vehicle would not require the suppression of the drugs where the officer learned nothing from the frisk and detention of the person that enabled him to locate the drugs. See United States v. Class, 883 F.3d 734, 738 (8th Cir. 2018). Here, the officers learned nothing from the frisk of defendant White that enabled them to locate the drugs or firearm in the vehicle.

B. The Warrantless Search of the Vehicle

Sergeant Bryant observed, while standing on a public street and looking in a vehicle's window,[3] a sandwich baggie full of white rock crystalline-like substances that, through his years of experience as a police officer, he identified as crack cocaine. (Fact No. 4) It is settled law that an officer "may seize, without a warrant, an item that is 1) in plain view 2) when it is observed from a lawful vantage point 3) where the incriminating character of the item is

---

[3]Looking through a car's window is not considered a search for Fourth Amendment purposes. See United States v. Brown, 653 F.3d 656, 661 (8th Cir. 2011), cert. denied, 565 U.S. 1241 (2012). See also United States v. Class, 883 F.3d 734, 738 (8th Cir. 2018)("There is no legitimate expectation of privacy shielding that portion of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.")

9

immediately apparent." United States v. Banks, 514 F.3d 769, 773 (8th Cir.), cert. denied, 553 U.S. 1100 (2008)(footnote omitted). See also Payton v. New York, 445 U.S. 573, 587 (1980)("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.") The Court finds that Sergeant Bryant observed the crack cocaine in plain view from a lawful vantage point. The Court further finds that the incriminating character of the crack cocaine was immediately apparent to Sergeant Bryant and that Sergeant Bryant had a lawful right to enter the vehicle to seize the crack cocaine. The seizure of the crack cocaine was proper under the "plain view" doctrine.

Based on Sergeant Bryant's discovery of the crack cocaine in plain view, the Court finds that Sergeant Bryant then had probable cause to search the vehicle under the automobile exception.[4] See United States v. Terry, 400 F.3d 575, 581 (8th Cir. 2005)(discovery of contraband in plain view in vehicle sufficed to create probable cause for officer to believe that vehicle contained additional contraband or evidence, making warrantless search proper under automobile exception); United States v. Rosas, No. 11-CR-188 RHK/SER, 2011 WL 7046028, *10 (D. Minn. Nov. 23, 2011)(officer's discovery of marijuana in plain sight in car provided sufficient probable cause for full search of car and its compartments based on automobile exception); United States v. Drake, No. 1:08CR131SNLJ, 2009 WL 1158675, *6 (E.D. Mo. Apr. 28, 2009)(observation of marijuana in plain view gave officer probable cause to search areas of

---

[4] In Arizona v. Gant, 556 U.S. 332, 347 (2009), the United States Supreme Court set forth the following with respect to the "automobile exception" to the warrant requirement: "If there is probable cause to believe a vehicle contains evidence of criminal activity, United States v. Ross, 456 U.S. 798, 820-21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found."

vehicle where further marijuana or other drugs could be hidden).

The vehicle was subsequently searched by officers other than Sergeant Bryant and a firearm was recovered from under the driver's seat. (Fact No. 7) When this search was conducted, the officers knew that they had been dispatched due to a 911 call that the occupants of the vehicle were involved with narcotics and possibly had guns (Fact No. 1), that Sergeant Bryant had discovered crack cocaine in plain view in the vehicle (Fact Nos. 4 and 6), and that defendant White had run from the scene (Fact No. 6). The Court finds that the officers had reason to believe that evidence of criminal activity would be found within the vehicle. Thus, pursuant to the automobile exception, the officers were authorized to conduct a warrantless search of the vehicle that was as thorough as a search authorized by warrant.

Given the Court's finding that Sergeant Bryant's initial entry into the vehicle to seize the crack cocaine was proper under the "plain view" doctrine and that the subsequent search of the vehicle was proper pursuant to the automobile exception to the warrant requirement, the Court need not address the issue regarding whether defendant White had standing to challenge the search of the vehicle[5] or the government's other justifications for the search.

C. <u>Statements</u>

Finally, defendant's motion seeks suppression of any statements he made as fruits of the unreasonable searches and seizures. As set forth above, the Court finds that no constitutional violation occurred. Therefore, any statements made by defendant could not be considered a fruit

---

[5]Defendant White's statements to Detective Straubel (i.e. that he was not in the vehicle when the police arrived, that he had not even been in the vehicle that day, that he denied ownership of the vehicle, and that he denied possession of the vehicle on that day (Fact No. 8)) would suggest White lacks standing to raise a constitutional challenge to the search of the vehicle. However, White's statements conflict with Sergeant Simons's testimony that as he was parking, he saw White open the driver's door of the vehicle and exit the vehicle. (Fact No. 2)

11

of the poisonous tree.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Lamont White's Motion to Suppress Evidence and Statement (doc #15).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                */s/ Sarah W. Hays*
                                                SARAH W. HAYS
                                      UNITED STATES MAGISTRATE JUDGE